**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**JUSTIN WAYNE ESTEP[1],**

      **Plaintiff,**

**vs.**                                        **CIVIL ACTION NO. 2:20-CV-00476**

**ANDREW SAUL, COMMISSIONER OF
SOCIAL SECURITY,**

      **Defendant.**

<u>**PROPOSED FINDINGS AND RECOMMENDATION**</u>

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f.  By Order entered July 17, 2020 (ECF No. 4), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Briefing with supplemental medical records, and Defendant's Brief in Support of Defendant's Decision. (ECF Nos. 17, 17-1, 17-2, 18)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's ostensible request for entry of an award for benefits or remand (ECF No. 17); **GRANT** Defendant's request

---

[1] For this appeal, Plaintiff has proceeded *pro se*, however, Plaintiff was represented by counsel throughout the underlying proceedings.

to affirm the decision of the Commissioner (ECF No. 18); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this matter from this Court's docket for the reasons stated *infra*.

**Procedural History**

The Plaintiff, Justin Wayne Estep, (hereinafter referred to as "Claimant"), protectively filed his applications for benefits on or about June 21, 2017, alleging disability since December 1, 2012[2], because of severe chronic depression, head injury resulting in memory loss, a crushed spine, impulsive behavior, and an inability to read or write above the 4th grade level. (Tr. at 384-387, 388-394, 410, 442) His claims were initially denied on September 12, 2017 (Tr. at 228, 229-238, 239, 240-249, 288-286, 287-291) and again upon reconsideration on March 13, 2018 (Tr. at 250, 251-265, 266, 267-281, 299-305, 306-314). Thereafter, Claimant filed a written request for hearing on April 10, 2018 (Tr. at 315-316).

An administrative hearing was held on March 6, 2019 before the Honorable Melissa Hammock, Administrative Law Judge ("ALJ"). (Tr. at 53-76) On June 12, 2019, the ALJ entered an unfavorable decision. (Tr. at 14-37) Subsequently, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 381-383) The ALJ's decision became the final decision of the Commissioner on May 8, 2020 when the Appeals Council denied Claimant's Request for Review. (Tr. at 1-6)

On July 13, 2020, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2) The Defendant (hereinafter referred to as "Commissioner") filed an Answer and a Transcript of the Administrative

---

[2] The record establishes Claimant's alleged onset date as of December 1, 2012 (i.e., Tr. at 17); in his application for benefits, he asserted that he stopped working on April 25, 2012 for other reasons, that is "[g]ot another job lined up but never made it due to head injury in May", and that his conditions became severe enough to keep him from working as of May 20, 2012. (Tr. at 410)

Proceedings. (ECF Nos. 14, 15) Subsequently, Claimant filed his "Briefing" (ECF No. 17), in response, the Commissioner filed a Brief in Support of Defendant's Decision (ECF No. 18). Consequently, this matter is fully briefed and ready for resolution.

**Claimant's Background**

Claimant was 24 years old as of the alleged onset date, and is defined as a "younger person" throughout the underlying proceedings. See 20 C.F.R. §§ 404.1563(c), 416.963(c). (Tr. at 31) Claimant has a limited education, having completed the 8th grade and attended special education classes; he attempted to obtain his GED but was unable to get a high enough score. (Tr. at 31, 61-62)[3] He had sporadic employment, having worked for Subway, Outback Steakhouse, as a telemarketer, and as a "helper" digging ditches, contracting, and remodeling work. (Tr. at 62-63, 411)

**Standard**

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims, 20 C.F.R. §§ 404.1520, 416.920.  If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§

---

[3] On his application forms, Claimant indicated that he did not attend special education classes (Tr. at 411), but testified that his wife and his attorney filled out some forms (Tr. at 61).

404.1520(b), 416.920(b).  If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c).  If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id.  If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(f), 416.920(f).  By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).

The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. §§ 404.1520(g), 416.920(g).  The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." Id. §§ 404.1520a(a), 416.920a(a).  First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c), 416.920a(c).  Those sections provide as follows:

4

(c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart P of part 404 of this chapter for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. See 12.00E of the Listing of Impairments in appendix 1 to subpart P of part 404 of this chapter.

(4) When we rate your degree of limitation in these areas (understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself), we will use the following five-point scale: None, mild, moderate, marked, and extreme. The last point on the scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the SSA finds that the claimant has a

severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. §§ 404.1520a(d)(3), 416.920a(d)(3). The Regulations further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. §§ 404.1520a(e)(4), 416.920a(e)(4).

**Summary of ALJ's Decision**

In this particular case, the ALJ determined that Claimant met the requirements for insured worker status through September 30, 2015. (Tr. at 19, Finding No. 1) Next, the ALJ determined that Claimant had not engaged in substantial gainful activity since December 1, 2012, the alleged onset date.[4] (Id., Finding No. 2)

At the second inquiry, the ALJ found that Claimant had the following severe impairments: major depressive disorder; generalized anxiety disorder; antisocial personality disorder; neurocognitive disorder; polysubstance abuse; and chronic pain syndrome status post T9 burst fracture, transverse process fractures of T10 and T11, and surgical fixation from T7 through T11. (Id., Finding No. 3)

At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 20, Finding

---

[4] The ALJ noted that Claimant's earnings records indicated that he had not collected income since 2011. (Tr. at 19, 401)

No. 4) The ALJ then found that Claimant had the residual functional capacity ("RFC") to

> lift, carry, push, or pull up to 10 pounds frequently, sit for six hours, and stand
> and/or walk for two hours in an eight-hour day. He requires the ability to alternate
> occasionally between sitting and standing with no loss in productivity. He can
> frequently balance and occasionally stoop, kneel, crouch, crawl, climb ramps, and
> climb stairs, but he can never climb ladders, ropes, or scaffolds, and he can have no
> exposure to workplace hazards, including unprotected heights and moving
> mechanical parts. The claimant can perform simple, routine tasks in a work
> environment with no production rate pace and no more than occasional changes in
> the work setting. He can have occasional interaction with supervisors and
> coworkers, but he can have no interaction with the public.

 (Tr. at 23-24, Finding No. 5)

At step four, the ALJ found Claimant had no past relevant work. (Tr. at 30, Finding No. 6)

In addition to the immateriality of the transferability of job skills, Claimant's age, education, work

experience and RFC, the ALJ determined that there were other jobs that existed in significant

numbers in the national economy that Claimant can perform. (Tr. at 31, Finding Nos. 7-10) Finally,

the ALJ determined Claimant had not been under a disability from December 1, 2012 through the

date of the decision. (Tr. at 32, Finding No. 11)

**Claimant's Challenges to the Commissioner's Decision**

In support of his appeal, Claimant alleges that he worked two jobs until 2012, but by May

2012 he experienced "manic depression" due to head trauma, although he had problems with this

since age 14. (ECF No. 17 at 1) In December 2012 he experienced a manic episode and broke his

spine; he sought treatment for his mental conditions but the medication prescribed to him made

him worse, so he quit taking them. (Id.) He alleged that his wife has noted that his memory and

manic problems are severe, and he is unable to care for his children without supervision and

assistance from family members. (Id. at 2-3) He alleges that his anxiety "will flare his chronic

pain." (Id. at 3) He disputes the ALJ's finding that he is able to lift up to 10 pounds, because he

"can hardly lift a full gallon of milk nor can [he] carry in groceries or handle the shopping." (Id.) He states that he was unable to keep his doctor appointments due to being able to get up or move; he can "hardly do anything more than lay on the couch or bed because this is how [he] get[s] the most relief." (Id.) Claimant alleges that he has additional medical problems that concern his heart and blood clotting issues and alleges his medical issues render him incapable of any type of employment. [5] (Id. at 4)

In response, the Commissioner asserts that Claimant fails to demonstrate how the ALJ failed to develop the record, and that his attorney represented at the hearing that the record was complete. (ECF No. 18 at 8) Additionally, the ALJ's RFC assessment is an issue solely reserved to the adjudicator; the RFC assessment is supported by substantial evidence, which was appropriately based on the psychological consultative evaluations and the sparse mental health treatment Claimant received during the relevant period. (Id. at 8-9) The ALJ considered the combined effects of all Claimant's impairments and rendered a decision supported by substantial evidence. (Id. at 9-10)

**The Relevant Evidence of Record**[6]

The undersigned has considered all evidence of record pertaining to Claimant's arguments and discusses it below.

The Medical Evidence:

Claimant's treatment record is sporadic. In June 2012, while incarcerated on charges of

---

[5] It is noted that a few of the treatment records Claimant submitted in support of his appeal are already part of the record of evidence before the ALJ (i.e., ECF No. 17-1 at 1-8), however, the majority of the new records were neither before the ALJ nor the Appeals Council, and post-date the ALJ's decision by several months to over well over a year (see, i.e., ECF No. 17-2).
[6] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

malicious wounding and domestic violence, Claimant told prison officials he would harm himself if not released on bond (Tr. at 516). Subsequently, he jumped from the second floor of the prison, which resulted in a head injury and 21 days of inpatient psychiatric care (Id.).  During his treatment, he was diagnosed with malingering and adjustment disorder (Id.). Upon discharge, the attending psychiatrist noted good mood, good affect, ingratiating manner, no delusions, and no suicidal or homicidal ideations (Id.).

Claimant required mental health treatment again in December 2012 after he either jumped or fell off a bridge, according to conflicting reports (Tr. 567-583).  Attending physicians diagnosed an unspecified depressive disorder and an unspecified personality disorder, treated with antidepressants, and discharged Claimant from psychiatric care after his condition improved (Tr. at 567-569).

Claimant also fractured his thoracic spine in the fall, requiring back surgery (Tr. at 643-647). He then reinjured his back during a fight in January 2013, after which he presented to an examination with tenderness in his back and moderate limitations in range of motion in the spine (Tr. at 608-609). Two months later, Claimant presented to the emergency room after being assaulted, and imaging studies revealed no acute injuries (Tr. at 595-605).

In May 2013, Claimant attended a consultative examination with psychologist Lisa Tate, M.A., pursuant to a prior application for benefits (Tr. at 519-524). At the examination, he showed full orientation, depressed mood, mildly restricted affect, no psychosis, normal judgment, normal psychomotor behavior, and only mild deficits in memory and concentration, normal pace, normal persistence, and normal social functioning (Tr. at 521). Ms. Tate administered the Wechsler Adult Intelligence test, and Claimant obtained a full-scale IQ score of 71, but Ms. Tate advised that

this may underestimate Claimant's abilities as he was complaining of back pain during the examination (Tr. at 522).

In August 2014, Claimant presented with back pain after slipping on his porch (Tr. at 728-729). Despite his complaints of moderate pain, an examination revealed no motor deficits, no weakness, no sensory loss, and normal reflexes (Tr. at 729).

In January 2015, while Claimant was participating in a GED program, he received psychiatric care for depression and suicidal ideation, although there was no apparent attempt at suicide (Tr. at 787-788). Claimant was discharged with an overall normal mental status (Id.). Seven months later, Claimant stopped taking his psychotropic medications, and he underwent another three-day inpatient psychiatric treatment after his girlfriend found him sitting in the dark with a knife, although again, there was no apparent suicide attempt (Tr. at 773-777).

Claimant received no further treatment for nearly three years.

Claimant underwent a consultative psychiatric examination in January 2018 with Emily Wilson, M.A., pursuant to his most recent application for benefits (Tr. at 796-801). Ms. Wilson noted that the information he provided was questionable in its reliability and completeness (Tr. at 797). Claimant reported he had married and had another child during his gap in treatment (Tr. at 799). During the examination, Claimant was very polite and cooperative with good eye contact, a broad affect, average insight, average grooming and hygiene, and normal pace and persistence, but he frequently cried and exhibited below average judgment, memory, and concentration, with significant deficits in immediate memory (Tr. at 799-800). Ms. Wilson diagnosed Claimant with major depressive disorder and generalized anxiety disorder, in addition to a rule-out diagnosis of a neurocognitive disorder (Tr. at 800).

10

Claimant underwent an internal medicine consultative examination in March 2018 (Tr. 803-807). Claimant displayed a steady gait with no difficulty transferring from a chair to the table, and he appeared comfortable in sitting and supine positions (Tr. at 804). He demonstrated slight deficits in his extremity motor strength but no signs of atrophy, and although he did not have lumbar spinal spasms or tenderness, straight leg raise testing was positive in the seated position (Tr. at 805). The examining physician noted Claimant put forth poor effort and his pain responses appeared disproportionate to his injury (Tr. at 806).

At an April 2018 psychiatric examination, Claimant reported that he was no longer taking any medications for his mental impairments (Tr. at 825). Yet, Claimant was calm, cooperative, and pleasant, with good impulse control and eye contact, smiling at appropriate times (Tr. at 828). He reported that his mood was "alright", and he had no active suicidal thoughts, and the psychiatrist observed he had good judgment with an adequate fund of knowledge and intact memory and concentration (Id.). The following July, Claimant presented with a normal mood and affect (Tr. at 808). Subsequently, he failed to attend multiple follow-up appointments, and when he did appear at an examination in August, he presented in a similar fashion, other than reporting his mood was "not too good," so his psychiatrist prescribed an increase in Effexor in addition to Seroquel daily and hydroxyzine as needed (Tr. at 816-819).

In September 2018, Claimant overdosed on heroin and required inpatient treatment for ten days, wherein he again received medication, individual therapy, and group therapy (Tr. at 835). In October 2018, Claimant again presented to the hospital complaining of depression and stating he had run out of his medications from the prior month (Tr. at 905). He discharged himself against medical advice (Id.). In November 2018, he once again became noncompliant with medications

and was hospitalized for 13 days (Tr. at 909-910). Claimant was diagnosed with antisocial personality disorder based on deceitfulness, repeated lying, impulsive behavior, and irritability leading to physical assault and threatening of others (Tr. at 918-919). Records from January 2019 indicate Claimant's mental status returned to normal after he became compliant with his medications (Tr. at 922).

**The Administrative Hearing**

Claimant Testimony:

Claimant testified that he lived with his wife and their two young daughters; he advised that his wife works and his mother-in-law watches the children while she's at work. (Tr. at 59-60) Claimant used to have a driver's license, but it had been suspended due to unpaid tickets and fines, and he was unable to pass the written exam. (Tr. at 60) Family members drive him when necessary. (Id.) He has supervised visitation with another daughter and a son who lives in North Carolina. (Tr. at 64)

Claimant testified that he went as far as the eighth grade in school, and attended "leaning disability classes"; he is able to read "somewhat", but needs help with writing, especially when filling out applications. (Tr. at 61-62) He can do simple math, like add and subtract (Tr. at 61); he can count change (Tr. at 65).

Claimant stated that he has pain in his back every day and that he will lay on a heating pad, take hot showers, and over-the-counter medications to relieve his pain. (Tr. at 65-66) He testified that his pain goes into his legs, and feels like a burning sensation on his thighs, and then progressively gets number as it goes down his legs into his feet. (Tr. at 66)

Claimant testified that any activity makes his pain worse; he just lays on the couch and is uncomfortable sitting in a recliner too long; he needs to switch positions. (Tr. at 66-67) He has trouble walking, and estimated he could walk a block or two in the summer, but during cooler and rainy seasons, he did not think he could walk a block. (Tr. at 67) He is unable to lift anything above his head, and may be able to carry bags of bread and a carton of eggs, maybe a gallon of milk. (Id.) He is right-hand dominant and is unable to "do much" with his left arm. (Tr. at 68) His pain has affected his appetite, where he will go two to three days without eating; his stomach stays upset. (Tr. at 69)

He does no chores around the house and says his wife does everything, but he wished he could say he did something, as she is overwhelmed. (Tr. at 70) He is able to take care of himself, like get dressed, get out of bed and fix himself breakfast, but if he's hurting real bad, he won't even get out of bed. (Tr. at 70-71) Sometimes, he wakes up in pain around 5:00 a.m., other times he will toss and turn in bed until 11:00 or 12:00 in the day; he usually retires between 9:30 to 10:30 at night. (Tr. at 71) He takes medicine to help him sleep; he had his prescriptions changed a few months earlier and said they are a little better now than before. (Id.)

Emotionally, Claimant testified that he had had a lot of suicide attempts, but thankful to be alive; he feels worthless and used to enjoy being around people, like family members, but somedays does not want anyone around, and does not want to have people see him when he's like that. (Tr. at 68-69) He said he often has crying spells. (Tr. at 69) He used to have hobbies, like playing basketball, but now has none except watch TV. (Id.) He denied using drugs recreationally, but admitted to overdosing on heroin on purpose. (Tr. at 69-70)

Vocational Expert ("VE") Testimony:

The impartial VE testified during the hearing with no objection from Claimant's attorney. (Tr. at 72) The ALJ asked the VE to assume a person of Claimant's age, education, and work experience who could perform sedentary work; could sit six hours in an eight-hour day; stand/walk two hours in an eight-hour day; occasionally alternate between sit/stand with no loss in productivity; frequently balance; occasionally stoop, kneel, crouch, crawl and climb ramps and stairs; never climb ropes, ladders, scaffolds; no exposure to workplace hazards, including heights and mechanical parts; can perform simple, routine tasks but not in a production-rate pace; no more than occasional changes in the work setting; occasional interaction with coworkers, supervisors, and no interaction with the public. (Tr. at 73)

The VE responded that such a person could perform the following: document preparer, lens inserter, and addresser, all unskilled sedentary jobs. (Tr. at 73-74) In response to questions from Claimant's attorney, the VE testified that the reading level for the document preparer job was at a 7/8 grade level and for the addresser job is was 4/6 grade level. (Tr. at 74-75)

**Scope of Review**

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner

is based upon an appropriate application of the law. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." <u>Blalock</u>, 483 F.2d at 775.

**<u>Analysis</u>**

As noted *supra*, Claimant has submitted additional medical records that document new diagnoses in October 2019 and October 2020, including a blood clot in his leg, a "heart attack" with "an enlarged heart on one side", as well as additional manic episodes with suicidal thoughts requiring hospitalization (ECF No. 17 at 2, 4-5). The undersigned construes this argument that the ALJ failed to develop the evidence of record, which establishes Claimant's claim for disability when considered in combination (<u>Id</u>.). Claimant also appears to disagree with the ALJ's RFC assessment (i.e. "I can hardly lift on a full gallon of milk nor can I carry in groceries or handle the shopping"; "I no longer can handle the sitting position long enough to enjoy even a 30 minute game of X-Box or handle more than 15 mins of being outside with my kids before I need to go rest"; "In the last 2 years my mom has ended up staying with us about 80% of the time as her and I both need someone to be there with us in case anything may happen. My increasing Manic Episodes, newly heart and blood clotting issues, and the forgetfulness I have been having makes my family and I feel unsafe to be alone."). (<u>Id</u>. at 3, 4) To that extent, it appears that Claimant argues that he is incapable of substantial gainful activity due to his impairments.[7] (<u>Id</u>. at 4)

---

[7] Arguably, Claimant has not presented a valid merits-based challenge to the ALJ's decision, but instead relies upon mere conclusions that the final decision is in error, thus Claimant's appeal herein is without legal or actual merit. <u>See</u>

<u>The Duty to Develop the Evidence:</u>

In <u>Cook v. Heckler</u>, the Fourth Circuit noted that an ALJ has a "responsibility to help develop the evidence." <u>Cook v. Heckler</u>, 783 F.2d 1168, 1173 (4th Cir. 1986). The Court stated that "[t]his circuit has held that the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely on evidence submitted by the claimant when that evidence is inadequate." <u>Id</u>. The court explained that the ALJ's failure to ask further questions and to demand the production of further evidence about the claimant's arthritis claim in order to determine if it met the requirements in the listings of impairments amounted to a neglect of his duty to develop the evidence. <u>Id</u>.

Nevertheless, it is Claimant's responsibility to prove to the Commissioner that he is disabled. 20 C.F.R. §§ 404.1512(a), 416.912(a) ("In general, you have to prove to us that you are blind or disabled. You must inform us about or submit all evidence known to you that relates to whether or not you are blind or disabled." Thus, Claimant is responsible for providing medical evidence to the Commissioner showing that he has an impairment, further, the Regulations are clear that this responsibility is ongoing at each level of the administrative review process. <u>Id</u>. The Supreme Court noted:

> The severity regulation does not change the settled allocation of burdens of proof in disability proceedings. It is true . . . that the Secretary bears the burden of proof at step five . . . [b]ut the Secretary is required to bear this burden only if the sequential evaluation process proceeds to the fifth step. The claimant first must bear the burden . . . of showing that . . . he has a medically severe impairment or

---

<u>Erline Co. S.A. v. Johnson</u>, 440 F.3d 648, 653 n.7 (4th Cir. 2006) (A "[c]onclusory remark is insufficient to raise on appeal any merits-based challenge."); <u>accord</u> <u>Sedghi v. PatchLink Corp.</u>, 440 F. App'x 165, 167 (4th Cir. 2011) ("By advancing only a conclusory argument, Sedghi has likely waived the issue."). However, because Claimant's *pro se* status allows for liberal interpretation of his pleadings and the Court has a duty to "scrutinize the record" as noted *supra*, the undersigned addresses those arguments ostensibly raised by Claimant in support of his appeal. See <u>Haines v. Kerner</u>, 404 U.S. 519, 520-21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972).

combination of impairments . . . .  If the process ends at step two, the burden of proof never shifts to the Secretary.  . . .  It is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so.

Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).

Although the ALJ has a duty to fully and fairly develop the record, she is not required to act as Claimant's counsel. Clark v. Shalala, 28 F.3d 828, 830-831 (8th Cir. 1994). In this case, Claimant was represented by counsel at the hearing and the ALJ has the right to assume that Claimant's counsel was presenting the strongest case for benefits. See Laney v. Astrue, 2011 WL 11889, at *11 (S.D.W. Va. Jan. 4, 2011) (Eifert, M.J.) (citing Nichols v. Astrue, 2009 WL 2512417, at *4 (7th Cir. 2009).  An ALJ's duty to develop the record does not require her to make specific inquiries into Claimant's treatment modalities or search for cumulative evidence; her duty is to obtain sufficient evidence upon which she can render an informed decision. Id. (internal citations omitted).

Claimant bears the burden of establishing a *prima facie* entitlement to benefits.  See Hall v. Harris, 658 F.2d 260, 264-65 (4th Cir. 1981); 42 U.S.C. § 423(d)(5)(A)("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require.") Similarly, Claimant "bears the risk of non-persuasion."  Seacrist v. Weinberger, 538 F.2d 1054, 1056 (4th Cir. 1976).

In this case, the ALJ expressly considered the medical evidence from May 2012 through early 2019[8] which included not only consultative examiner reports regarding Claimant's physical

---

[8] The ALJ also considered the evidence that long preceded the December 1, 2012 alleged onset date, including Claimant's educational records, in addition to the medical records generated just under a month before to the administrative hearing on account of the numerous exhibits attached to the written decision in addition to the ALJ's citations to these records throughout the written decision. (Tr. at 33-37) "Absent evidence to the contrary, it must be presumed that the ALJ reviewed all of the materials in the record and presented by the [Claimant]." Turner v. Berryhill,

and mental impairments, but also treatment records from his care providers for his various ailments. (Tr. at 20-30). In addition, the ALJ reviewed other evidence, which included Claimant's statements in his application forms concerning his limitations from his physical and mental conditions, his school records, and his own testimony during the administrative hearing. (Tr. at 21-22, 23, 24, 26-27, 30) The ALJ also considered the opinions provided by the state agency consultants. (Tr. at 29-30) Specifically, the ALJ noted and considered Claimant's testimony regarding his memory problems, his crushed spine injury, his chronic severe depression, his history of impulsive behavior, as well as his reading and writing abilities (Tr. at 24) The ALJ considered the limiting effects resulting from his pain, and what he does to help alleviate same. (Id.)

Claimant does not specify what evidence the ALJ lacked in order to make an informed decision, although he refers to new medical conditions concerning his heart and blood clotting issues, and endorses a generalized worsening of his impairments. (ECF No. 17 at 4) Nevertheless, it is clear that the ALJ made numerous references throughout her decision concerning the evidence of record, which included Claimant's own statements concerning the frequency and limiting effects of his impairments. Indeed, the record demonstrates that Claimant underwent two consultative psychological examinations, one with Ms. Tate in May 2013, another in January 2018 with Ms. Wilson, and then and a medical evaluation in March 2018, in order to develop the record (Tr. at 25-26, 28, 519-525, 796-802, 803-807). In short, Claimant has failed to demonstrate any paucity in the evidence that would have necessitated the ALJ to further develop the record.

---

2017 WL 2805498, at *4 (N.D.W. Va. June 28, 2017) (citing Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000) ("[A]n ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite to specific evidence does not indicate that it was not considered."). "[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in [her] decision." Reid v. Commissioner of Social Sec., 769 F.3d 861, 865 (4th Cir. 2014) (quoting Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005) (per curiam).

To the extent that Claimant contends that his new heart and clotting conditions merit reversal and/or remand, it is noted that on May 8, 2020, the Appeals Council determined that the additional evidence[9] submitted by Claimant did not show a reasonable probability that it would change the outcome of the ALJ's decision (Tr. at 1-3), and as a result, denied Claimant's request for review of the ALJ's decision and did not exhibit the late-submitted evidence (Id.).

Social Security Regulations allow two types of remand. Under the fourth sentence of 42 U.S.C. § 405(g), a court has the general power to affirm, modify or reverse the decision of the Commissioner, with or without remanding the cause for rehearing for further development of the evidence. 42 U.S.C. § 405(g); Melkonyan v. Sullivan, 501 U.S. 89, 97-98, 111 S.Ct. 2157, 2163, 115 L.Ed.2d 78 (1991). Where there is new medical evidence, a court may remand under the sixth sentence of 42 U.S.C. § 405(g) based upon a finding that the new evidence is material and that good cause exists for the failure to previously offer the evidence. 42 U.S.C. § 405(g); Melkonyan, 501 U.S. at 98, 111 S.Ct. at 2163. The Supreme Court has explicitly stated that these are the only kinds of remand permitted under the statute. Melkonyan, 501 U.S. at 98, 111 S.Ct. at 2163.

Pursuant to 42 U.S.C. § 405(g), remand is warranted "upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding[.]" Evidence is "new" if it is not duplicative or cumulative. Wilkins v. Secretary, Dep't of Health & Human Serv., 953 F.2d 93, 96 (4th Cir. 1991) (en banc). "Evidence is material if there is a reasonable possibility that the new evidence would have changed the outcome." Id. The Regulations governing the circumstances under which the Appeals Council

---

[9] The additional evidence concerned treatment notes from St. Mary's Medical Center from April 7, 2012 to November 10, 2018 and from Marshall Health from January 14, 2019 through April 4, 2019, plus a letter from Claimant's wife (Tr. at 38-52, 7-8). Notably, none of these additional medical records concern heart or blood clotting issues or treatment for Claimant's mental impairments.

is to review an ALJ decision shows that additional evidence will not be considered <u>unless</u> the evidence is new and material and relates to the period on or before the date of the ALJ decision. <u>See</u> 20 C.F.R. § 404.970(a)(5) (emphasis added). This does not mean that the evidence had to have existed during that period; rather, evidence must be considered if it has any bearing upon whether the claimant was disabled during the relevant period of time. <u>See</u> <u>Wooldridge v. Bowen</u>, 816 F.2d 157, 160 (4th Cir. 1987); <u>Cox v. Heckler</u>, 770 F.2d 411, 413 (4th Cir. 1985); <u>Leviner v. Richardson</u>, 443 F.2d 1338, 1343 (4th Cir. 1971). "Pursuant to the regulations . . . , if additional evidence submitted by a claimant does not relate to the time period on or before the ALJ's decision, the evidence is returned to the claimant, and the claimant is advised about her rights to file a new application." <u>Adkins v. Barnhart</u>, 2003 WL 21105103, *5 (S.D.W. Va. May 5, 2003).

Additionally, the Appeals Council "will only consider additional evidence" that satisfies the requirements of 20 C.F.R. § 404.970(a)(5) if the claimant also shows "good cause" for not informing or submitting it to SSA prior to the hearing for the following specific reasons:

(1)    our action misled you;

(2)    you had a physical, mental, educational, or linguistic limitation(s) that prevented you from informing us about or submitting the evidence earlier; or

(3)    some other unusual, unexpected, or unavoidable circumstance beyond your control prevented you from informing us about or submitting the evidence earlier. Examples include, but are not limited to:

    (i)    you were seriously ill, and your illness prevented you from contacting us in person, in writing, or through a friend, relative, or other person;

    (ii)    there was a death or serious illness in your immediate family;

    (iii)    important records were destroyed or damaged by fire or other accidental cause;

    (iv)    you actively and diligently sought evidence from a source and the

> evidence was not received or was received less than 5 business days prior to the hearing; or

(v)    you received a hearing level decision on the record and the Appeals Council reviewed your decision.

Id. § 404.970(b).

Where evidence is not new, material, does not relate to the period on or before the hearing decision, does not create a reasonable probability that it would change the outcome of the case, or there is no good cause for failure to submit the evidence earlier (*e.g.*, unusual or unexpected circumstances such as death, illness, destruction of it by fire, or confirmation that the claimant actively and diligently sought evidence from a source who would not provide it earlier), the Appeals Council will send notice explaining why the evidence was not accepted and advise the claimant of his right to file a new application. Id. § 404.970(c).

Significantly, the Appeals Council informed Claimant of these pertinent Regulations in its May 8, 2020 notice. Indeed, the Appeals Council advised Claimant that he "must" show that the additional evidence is new, material, relates to the period at issue, and shows a reasonable probability of changing the outcome of the hearing decision, and that Claimant "must show good cause" for why he missed informing the agency about the evidence or submitting it earlier. (Tr. at 1-2).

As discussed above, the evidence submitted to the Appeals Council consisted of several additional treatment records, most of which were already before the ALJ for her consideration, or were dated several years after Claimant's date last insured. There has been no indication by Claimant as to why this evidence was not submitted during the prior proceeding, and no such explanation was provided to the Appeals Council. Claimant has provided no reason or argument that he meets any of the other specific good cause definitions outlined in 20 C.F.R. § 404.970(b).

See Scherer v. Berryhill, No. 2:17-CV-53, 2018 WL 1960531, at *3 (W.D. Va. Apr. 26, 2018) ("Without the plaintiff failing into one of these good cause exceptions, the Appeals Council had no such duty to review the [additional] evidence."). Nevertheless, none of the additional records submitted by Claimant to the Appeals Council contains new and material evidence that would have a reasonable probability in changing the outcome of the ALJ's decision.[10]

Accordingly, the undersigned **FINDS** that Claimant's contention that the ALJ erred by failing to develop the record is without merit.

The Combination of Impairments:

Although Claimant has asserted that he suffers from both mental and physical impairments that render him disabled, he does not specify which impairment specifically meets or equals any Listing. The Regulations provide:

---

[10] As noted *supra*, Claimant submitted additional files to this Court, which included treatment notes dated April 24, 2019 and September 11, 2019 from Prestera Center (ECF No. 17-1 at 9-16) Notably, the mental status examinations from these particular records indicate that Claimant appeared well-groomed; an "ok" mood; euthymic affect; normal speech; motor behavior and thought content within normal limits; normal speech, recall memory; full orientation; logical thought process; no noted abnormalities in perceptual experience; a steady gait and station; "attention/concentration focused"; and intact insight and judgment (Id. at 10, 14).

Claimant also submitted numerous medical records from St. Mary's Medical Center dated October 7, 2019 through January 14, 2021 (ECF No. 17-2). Included among these records are treatment notes from October 2019 concerning a lower extremity thrombosis which had "resolved" through balloon angioplasty (see, i.e., ECF No. 17-2 at 75); these records indicated that Claimant reported an onset of pain three weeks prior while operating a weed eater whereby he sustained a mild trauma, with the pain gradually becoming worse over the three-week period, culminating to a trip to the Emergency Room (Id. at 61, 73). The records indicate he was treated and released after a three-day hospitalization (Id. at 47-86); upon discharge, Claimant was instructed not to strain or lift anything heavier than 10 pounds for two weeks. (Id. at 47)

Other records from St. Mary's Medical Center are dated February 4, 2020, when Claimant presented to the Emergency Department following a fall on his porch; imaging taken during this period were unremarkable - the heart size was within normal limits (Id. at 44) and there were no significant changes noted in his thoracic spine (Id. at 4, 42) and no changes to his lumbar spine (Id. at 43).

Other records from St. Mary's Medical Center from October 2020 indicated Claimant underwent a heart catheterization which he tolerated well; the conclusion was "[a]typical aneurysm segment likely due to prior infarction due to spontaneous dissection distal LAD; however, there is now flow restored in the LAD territory with an ejection fraction on left ventriculography of 45-50%." (Id. at 8) Testing findings indicated a normal size heart, with normal wall thicknesses, and normal functioning (Id. at 10-11) Also from October 2020 are imaging reports concerning Claimant's cervical, thoracic and lumbar spine, all of which revealed no acute findings (Id. at 21-23).

Finally, the most recent record from St. Mary's Medical Center is dated January 14, 2021 that concerns Claimant's complaints of chest pain; imaging indicated clear lungs and no acute findings (Id. at 3).

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.

See 20 C.F.R. §§ 404.1523(c), 416.923(c). When confronted with a combination of impairments, an adjudicator must not only acknowledge "the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's ability to engage in substantial gainful activity." Oppenheim v. Finch, 495 F.2d 396, 398 (4th Cir. 1974). The Fourth Circuit has held that the ailments should not be fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity. Id. In short, the ALJ must analyze the cumulative or synergistic effect that the various impairments have on Claimant's ability to work. DeLoatche v. Heckler, 715 F.2d 148, 150 (4th Cir. 1983).

"The Listing of Impairments . . . describes for each of the major body systems impairments that we consider to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." See 20 C.F.R. §§ 404.1525(a), 416.923(a); Sullivan v. Zebley, 493 U.S. 521, 532 (1990). To qualify for benefits, Claimant must show that his combination of impairments is "equivalent" to a listed impairment, and he "must present medical findings equal in severity to all the criteria for the one most similar listed impairment." See Id. at 531.  A claimant must meet all, not just some, of the criteria for a listing to apply. Id. at 530.

It is important to note that at the second step in the sequential evaluation process, the ALJ found that while records listed traumatic brain injury (TBI) under Claimant's history of active

23

problems (Tr. at 20, 813), corresponding medical records from the time of the actual injury in 2012 do not list such a diagnosis (Tr. at 20, 689, 696-702, 714, 719). The ALJ also noted that a neurologist who examined Claimant at the hospital in 2012 determined his head injuries had not produced any significant deficits (Tr. at 20, 517). Because this diagnosis was given five years after the injury and insufficient objective findings in the evidence to support this diagnosis, the ALJ determined TBI to be a non-medically determinable impairment (Tr. at 20). Also, the ALJ observed that Claimant was diagnosed with borderline intellectual functioning (BIF) from a psychologist's May 2013 testing, indicating Claimant's full-scale IQ was 71 (Tr. at 20, 522-523). The ALJ noted that another psychologist affirmed this diagnosis in 2018, but that was based on the prior testing, but found that Claimant scored in the average range in every subtest of the Cognistat test, aside from mild deficiencies in memory and similarities (Tr. at 20, 800-801) The ALJ next noted that state agency psychological consultants opined that the BIF diagnosis was inappropriate, because there was no evidence he had an intellectual disorder prior to age 22 (Tr. at 20, 235, 246, 257, 262-263, 273, 278-279); the ALJ also noted that Claimant's educational records indicated that in eighth grade, his full-scale IQ was 90, a verbal score of 97, and a performance score of 84, which was in the average range (Tr. at 20, 504, 506). Additionally, the ALJ noted from the educational records that while Claimant had difficulty with written expression and basic reading, and had an IEP, he was in regular education classes with no special education placement (Tr. at 20, 496, 498, 500). Based on this evidence, the ALJ found the diagnosis of BIF a non-medically determinable impairment (Tr. at 20).

Next, at the third step of the sequential evaluation process, the ALJ herein evaluated Claimant's impairments under Section 1.04, finding no medical proof supporting any of the

requisite findings established in a single examination, including: nerve root compression with limited spinal range of motion, atrophy with muscle weakness, and sensory or reflex loss, along with positive sitting and supine straight-leg raise testing if the lumbar spine is involved; spinal arachnoiditis manifested by severe burning or painful dysesthesia and resulting in the need to change position or posture more than once every two hours; or lumbar spinal stenosis resulting in pseudoclaudication manifested by chronic nonradicular pain and weakness with the inability to ambulate effectively (Tr. at 20-21) While acknowledging that Claimant suffered multiple vertebral fractures from a 2012 fall, the ALJ found the radiographic evidence neither establishes any postoperative findings of spinal stenosis or nerve root compression (Tr. at 21, 596, 601-604, 643, 654, 663) nor a diagnosis of spinal arachnoiditis. Additionally, the ALJ considered chronic pain syndrome, noting this is not a listed impairment, however, none of Claimant's symptoms related to chronic pain syndrome at listing level severity pursuant to Social Security Ruling (SSR) 03-02p[11] (Tr. at 21).

With respect to Claimant's mental impairments, and although the ALJ determined Claimant's diagnoses of major depressive disorder, generalized anxiety disorder, antisocial personality disorder, neurocognitive disorder, and polysubstance abuse were severe at the second step (Tr. at 19), at the third step, the ALJ determined these impairments singly or in combination did not meet or medically equal the criteria of Listings 12.02, 12.04, 12.06, and 12.08. (Tr. at 21)

In understanding, remembering, or applying information, the ALJ determined Claimant had a moderate limitation based on Claimant's reports in having trouble with comprehension and

---

[11] SSR 03–2p provides guidance for evaluating claims of disability based on Reflex Sympathetic Dystrophy Syndrome (RSDS or RSD), also known as Complex Regional Pain Syndrome (CRPS). See SSR 03–2p, 2003 WL 22399117 and 2003 WL 22814447.

memory, with specific difficulties with reading and math and that although he "could read somewhat", he needed help to understand and fill out the forms for his Social Security claim (Tr. at 21, 432, 450-457, 458-462). The ALJ also recognized the conflicting evidence concerning Claimant's intellectual functioning, *supra*, but also noted that the March 2018 psychological consultant found Claimant's intellectual functioning to be average and that his recent and remote memories were intact (Tr. at 21, 804) The ALJ again noted that the evidence concerning Claimant's intellectual functioning contained mixed findings, with examination results ranging from mile to below average deficits (Tr. at 21, 521, 523, 799-800, 804, 828-829); the ALJ compared this evidence with Claimant's activities of daily living, noting that he stated in his Function Report that he performs some childcare for his daughter, watching her and changing her diaper, feeding her, and taking care of his pets and letting them go outside (Tr. at 21-22, 433, 835[12]) Again referring to statement asserted in his Function Report, the ALJ noted Claimant had no problems fixing himself simple meals, and only alleged physical problems with self-care; that he requires no reminders to take care of personal needs, groom himself, take medications, or to go to places; that he goes out two to three times a week and can travel alone (Tr. at 22, 433-436). The ALJ also noted Claimant was capable of operating a washing machine and while he noted Claimant did not have a driver's license at the time of the hearing, "at one point during the relevant period, [Claimant] drove himself to a consultative examination" (Tr. at 22, 434-435, 519-521). The ALJ next noted that Claimant admitted he could pay bills, count change, handle bank accounts and that his ability to handle finances had not changed due to his impairments (Tr. at 22, 435-436). Finally, the ALJ noted Claimant plays X-Box a couple times per month, went grocery shopping one or

---

[12] The ALJ referred to an intake report from River Park Hospital from September 2018.

twice a week in 2013, and though Claimant indicated he does not finish tasks he starts, he could follow a recipe well enough, though he forgets verbal instructions and needs them repeated several times (Tr. at 22, 436, 523)

In interacting with others, the ALJ found that Claimant also had moderate limitations based on 2018 records indicating that he was diagnosed with antisocial personality disorder due to deceitfulness, repeated lying, impulsive behavior, and irritability leading to the physical assault and threatening of others (Tr. at 22, 919-920. The ALJ compared this to other medical records where Claimant was observed to be generally calm, polite, and cooperative (Tr. at 22, 519-523, 799-800, 817-820, 825, 828). In addition, the ALJ noted from Claimant's Function Report that he did not have problems getting along with family, friends, authority figures, or others, just that he did not go out as often as he used to (Tr. at 22, 436-437). The ALJ also recognized that Claimant never lost a job due to interpersonal problems, and that he is married with children and helps provide childcare (Tr. at 22, 433, 438, 523, 835). Again, the ALJ observed Claimant reported going out two or three times per week, can travel alone, and that he talks, visits and eats dinner with family and attends church on a regular basis (Tr. at 22, 434). The ALJ determined that "[b]ased on the overall record, a single instance of poor social functioning does not support a 'marked' or 'extreme' finding" and therefore found Claimant only had moderate limitations in interacting with others (Tr. at 22).

In concentrating, persisting, or maintaining pace, the ALJ found that Claimant had a moderate limitation, again making this determination based on his educational records indicating some deficits in processing speed, requiring extended time for assignments (Tr. at 22, 498, 500, 504, 506) as well as the "mixed findings" from the medical record "as to his ability to concentrate

and maintain attention, with periodic deficits ranging from mild to 'below average', contrasting with his longitudinally normal ability to concentrate and maintain pace and persistence" (Tr. at 22, 521-523, 799-800, 817-820, 828-829, 922). The ALJ referred to Claimant's statements in his Function Report as well, noting that he reported being able to pay attention for an hour or two, and finding this consistent with the medical findings (Tr. at 22, 437); the ALJ again referred to Claimant's alleged activities of daily living, including watching television, playing X-Box, travelling alone, paying bills, handling a bank account, helping care for his young daughter, as well as his driving himself at one point during the relevant period for a consultative examining as additional indicators of Claimant's level of functioning in this area.

Finally, with regard to adapting and managing oneself, the ALJ found that Claimant had a moderate limitation, noting that his medical history included two suicide attempts, one in 2012 and the other in 2018, indicating he has deficits in his ability to manage his symptoms (Tr. at 23, 516, 835). While again noting his abilities to manage critical self-care activities on an independent basis within his physical limitations as indicated in his Function Report, discussed *supra* in the previous functional areas, the ALJ acknowledged Claimant indicated he did not handle stress for a while after his impairments began, though his ability to deal with it improved, with at times feeling overwhelmed (Tr. at 23, 438). The ALJ also noted Claimant stated he did not like changes in routine, "but he can get used to them" (Id.). Finally, the ALJ noted that the medical records show some deficits in insight, but Claimant generally presented with fair to normal judgment, especially when compliant with medication (Tr. at 23, 516, 518, 521-523, 797-800, 817-820, 828-829).

Having determined that Claimant's mental impairments did not result in any "marked" or

"extreme" limitations, the ALJ found that no "paragraph B" criteria had been met. (Tr. at 23) The ALJ specifically observed that while Claimant stated his ability to deal with stress had improved, and that he only feels overwhelmed at times, and that he does not changes in routine, but could get used to them, such evidence, in addition to the lack of evidence otherwise, "paragraph C" criteria has not been met. (Tr. at 23, 438)

Clearly, the ALJ considered the evidence of record with respect to Claimant's physical and mental impairments and correctly determined that despite the myriad of medical conditions Claimant had experienced since his alleged onset date, there is no indication in the record that supports his contention, to the extent it can be construed as such, that his impairments met any Listing criteria, either singly or in combination. Indeed, the record contains no opinion by any physician, treating or examining, that confirms Claimant's physical or mental impairments met any Listings.

Accordingly, the undersigned **FINDS** that to the extent Claimant argues that his impairments, singly or combined, met Listing requirements lacks merit.

The RFC Assessment:

To the extent that Claimant is arguing that the RFC assessment is not supported by substantial evidence, as noted *supra* at footnote 6, this Circuit has recognized that "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision" Reid v. Comm'r of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014) (quoting Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005) (*per curiam*)). Instead, an ALJ " 'must build an accurate and logical bridge from the evidence to his conclusion.' " Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (quoting Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000)). In this case, the ALJ provided more

than sufficient notations from the record that documented Claimant's subjective complaints related to his physical impairments, which primarily stem from his fractured thoracic vertebrae sustained from his fall from a second-floor jail balcony in May 2012 (See, e.g., Tr. at 27-28), and compared these with the overall evidence before her.

Notably, the ALJ observed

As stated, there are gaps in the claimant's treatment records lasting up to two years, and regardless of the reasons for those gaps, the lack of objective evidence from those relevant periods takes away from the allegations of ongoing limitation, as objective evidence is required to establish or corroborate such claims. Moreover, as I previously discussed, the examination records from 2018 are mixed with regard to the intensity and extent of the claimant's physical signs and symptoms, and there are multiple indications in the record that the claimant's pain responses during examinations were disproportionate to his impairments. I took these inconsistencies and gaps into account during the residual functional capacity finding, and weighed them against the available medical evidence to draw the conclusions I explained above.

(Tr. at 28)

In addition to her review of the relevant medical evidence, discussed in greater detail, *supra*, the ALJ considered the opinion evidence provided by state agency medical consultants, Drs. Caroline Williams and Uma Reddy, both of whom opined they were unable to make an assessment during the relevant time due to insufficient evidence (Tr. at 29, 233, 244, 256, 259-260, 272, 275-276). The ALJ noted, however, that despite affirming Dr. Williams' opinion, Dr. Reddy provided an RFC indicating Claimant was capable of medium work with certain postural limitations (Id.); significantly, the ALJ noted that "very little of the evidence – none of it regarding the claimant's impairments during the relevant Title II period – was available for review even at the reconsideration level when Dr. Reddy formed her opinions." Since the opinions did not "accurately portray the longitudinal evidence" concerning Claimant's multiple thoracic fractures

and the resulting moderate to severe spinal tenderness with accompanying range of motion and slight motor deficits, the ALJ determined that Claimant was more limited during the relevant period, and accordingly, determined Claimant was capable of sedentary level work with additional physical limitations. (Tr. at 29, 587-588, 605, 619, 634, 643, 646-647, 663, 750, 753, 804-806, 810-815, 833, 867, 893-896, 903-904)

With regard to Claimant's mental impairments, again, the ALJ provided more than sufficient notations from the record that documented Claimant's symptomology resulting from his mental health conditions, (See, e.g., Tr. at 25-27), and compared these with the overall evidence before her. In addition to her review of the relevant medical evidence, discussed in greater detail, *supra*, the ALJ considered the opinion evidence provided by state agency psychological consultants, Drs. Debra Lilly and Joseph Richard, both of whom opined there was insufficient evidence to substantiate the presence of a mental disorder, and that the diagnosis of BIF appeared inconsistent with Claimant's recorded IQ at age 14 (Tr. at 29, 235, 246). The ALJ noted that Dr. Richard provided a mental RFC: that Claimant could understand, remember, and carry out simple but not detailed tasks in a low stress environment; that despite his limitations in maintaining pace and concentration, and difficulty relating to the public and coworkers, Claimant could accept supervision, deal appropriately with criticism, adjust to tasks settings, manage stress, and deal with normal changes (Tr. at 29, 257, 262-263, 273, 278-279). Once again, the ALJ observed that neither consultant were privy to the medical evidence at the hearing level because most of it was submitted after their respective reviews, thus, the ALJ determined their opinions did not accurately reflect the longitudinal evidence that was available to her (Tr. at 29-30). Nevertheless, the ALJ considered their assessments as to BIF being a non-medically determinable impairment, as well as Dr.

Richard's RFC assessment to the extent that Claimant is limited to simple, routine tasks was consistent with the mental status findings throughout the record of evidence (Tr. at 30, 519-523, 797-800, 817-818, 828-829, 922). The ALJ determined that Claimant's educational records showing deficits in processing speed and additional time for assignments supported Dr. Richard's suggestion of low stress work, although the ALJ found that term required further definition in the RFC finding (Tr. at 30, 496-500). The ALJ disagreed with Dr. Richard's opinion concerning Claimant's social limitations, because Claimant has stated he did not have a problem getting along with others in a general sense (Tr. at 30, 432-441); the ALJ also determined that his opinion, though not firm, did not reflect the longitudinal evidence that Claimant demonstrated "an overall calm, cooperative, polite presentation despite periodic polysubstance abuse" (Tr. at 30, 519-523, 533, 776, 799-800, 817-820, 825, 828, 835, 838). Again, noting Claimant's 2018 presentation as "irritable and threatening of others", the ALJ determined Dr. Richard's social limitations less persuasive. (Tr. at 30)

Additionally, to the extent that Claimant has argued his diagnoses (including the more recent ones documented in the medical records he submitted in support of this appeal) and treatment notes corroborate a disability finding, it is well known that the Regulations specifically reserve disability and work-related determinations solely to the Commissioner, and any medical opinions with respect to same do not enjoy any special significance. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).[13] In any event, none of these records contain any statements concerning functional limitations or what Claimant "can still do despite [his] impairment" that would lend themselves to a proper evaluation of opinion evidence as entertained by 20 C.F.R. §§ 404.1527, 416.927. Once

---

[13] See also, 20 C.F.R. §§ 404.1545(a), 404.1546(c) (the RFC assessment is solely within the adjudicator's purview, not a physician's).

again, because diagnoses alone do not establish disability, because there must be a showing of related functional loss. Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986). Therefore, Claimant's recap of the numerous diagnoses and treatment provided to him, without any corresponding functional limitations, is of no moment. Nevertheless, as discussed *supra*, the ALJ did consider these records in rendering his decision, with the notable exceptions of that evidence that was submitted either directly to the Appeals Council or to this Court.

To the extent that Claimant suggests that he is incapable of all substantial gainful activity, thereby precluding the jobs identified by the vocational expert, it is noted that this Circuit has long since held that hypothetical questions need only incorporate those limitations that an ALJ accepts as credible and that are supported by the record. See Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). It is clear from the ALJ's recitation of the record, which included the medical evidence and other evidence of record, that much of this contained conflicting findings, and to the extent where those findings were generally consistent with the overall evidence of record, the ALJ explained her reasonings for her conclusions. As stated above, the reconciliation of conflicting evidence was for the ALJ to resolve, not this Court. See SSR 96-8p, 1996 WL 3741784, at *7. Given the foregoing review of the evidence of record, the undersigned **FINDS** that the vocational expert's responses to the ALJ's controlling hypothetical question were supported by substantial evidence, and further **FINDS** that the ALJ was entitled to rely upon those responses at the fifth step of the sequential evaluation process. See 20 C.F.R. §§ 404.1560(c)(2); 404.1566(e); 416.960(c)(2); 416.966(e). In sum, the undersigned **FINDS** the RFC assessment is supported by substantial evidence.

Although Claimant advocates for an alternate decision, such are matters that involve resolving the conflicting evidence of record, which is an evidentiary finding within the purview of the ALJ. In short, though Claimant may disagree with the ALJ's determination that he can work at sedentary exertional levels for an eight-hour workday, this Court cannot re-weigh this conflicting evidence or substitute its judgment for the Commissioner's. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); see also, SSR 96-8p, 1996 WL 3741784, at *7.

In short, the ALJ's narrative of the record included the objective medical evidence, including imaging and examination findings, as well as the other evidence of record, including Claimant's educational records and his own statements and testimony; the ALJ's thorough discussion of all this evidence, and her ultimate determination that Claimant remained capable of sedentary work during the relevant period despite his subjective complaints and related symptomology, provided sufficient explanation allowing for meaningful judicial review. Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015). This Court is not "left to guess about how the ALJ arrived at his conclusions" therefore remand is not necessary. Mascio, 780 F.3d at 637.

Finally, the undersigned further **FINDS** that in light of the ALJ's analysis of the evidence of record, the final decision denying Claimant's applications for benefits is supported by the substantial evidence.

## Recommendations for Disposition

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's request for reversal or remand (ECF No. 17), **GRANT** the Defendant's

request to affirm the decision below (ECF No. 18), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from this Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Irene C. Berger, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Berger, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: March 18, 2021.



Omar J. Aboulhosn
United States Magistrate Judge